GARWOOD (NEWLIN v.). See Case No. 10,172.

———

## Case No. 5,259.

### The GARY v. The SHERMAN.

[Chase, 468.] [1]

Circuit Court, D. South Carolina. June Term, 1869.

SALVAGE AND TOWAGE—FRAUDULENT PURPOSE ON PART OF TOW TO AVOID TOWAGE.

The Sherman was lying helpless in a dangerous locality, with her engine broken and useless, and in answer to her signals of distress, the Gary came to her relief, and contracted with her captain to tow her into Norfolk for fifteen thousand dollars. On their way thither it was determined between them to go to Charleston instead, and while going there, a false alarm was given that they were in shoal water. At this point of time, the hawser connecting the vessels parted, and there was some reason to believe the Sherman cut it, and the wind being favorable, the Sherman pursued her way by using her sails. There was sufficient evidence of a fraudulent purpose on the part of the Sherman to avoid the towage, to justify the Gary in not pursuing her and renewing her offers of assistance. Another steamer towed the Sherman into port. *Held,*—the Gary is not entitled to recover the contract price, but she is entitled to salvage, although the second vessel be also entitled to it; and the second vessel is entitled to it.

[Appeal from the district court of the United States for the eastern district of South Carolina.]

1 [Reported by Bradley T. Johnson, Esq., and here reprinted by permission.]

A. G. Magrath, for libellant.

Porter & Conner, for defendants.

The claim for compensation must rest upon salvage service rendered, or upon the contract made. As to salvage service: A salvage compensation can be awarded only to persons by whose agency the vessel was saved. Unless the property be saved in fact by those who claim as salvors, salvage will not be allowed. Montgomery v. The T. P. Leathers [Case No. 9,736]; The Pandora [Id. 4,442]. The indispensable ingredient of a salvage service is that of having contributed immediately to the preservation or rescue of the property in peril at sea. The John Wurts [Id. 7,434], Betts, J. The foundation of the claim for salvage is the rescue of the property from peril, and the placing it in safety—and unless the salvor does place the property in safety, he is not entitled to salvage compensation. "It is an undisputed principle upon which a claim for salvage at all times rests, that unless the property be in part saved by those who claim the compensation, it can not be allowed, be their intentions however benevolent, and their conduct however heroic." Clarke v. The Dodge Healy [Id. 2,849]. "The property must be effectually saved. It must be brought into some port of safety; and it must be then in a state capable of being restored to the owner before the service can be deemed complete." The Henry Eubank [Id. 6,376]. If there is, from any cause, an absolute voluntary abandonment of the property on the high seas by the salvors, they are not entitled to salvage. Id. The right to contribution or compensation as co-salvor or joint salvor, applies only where the efforts of second salvors are in connection with and continuation of the efforts of the first salvors—where it is one and the same enterprise, and not to cases where the first salvors have abandoned their effort, sine animo revertendi, and sought their port of destination. The India, 1 W. Rob. Adm. 409; The Jonge Bastiaan, 5 C. Rob. Adm. 322; The Samuel, 4 Eng. Law & Eq. 581; The Henry Eubank [supra]; The John Wurts [supra]. When first set of salvors voluntarily and entirely abandon their enterprise, and a second salvor comes in and effects the salving, it is an entirely new enterprise. The second salvor is entitled to the entire compensation, and the first salvor has no right to claim compensation for efforts which he abandoned before placing the property in safety. The India, 1 W. Rob. Adm. 406; The Henry Eubank [supra]; The John Wurts [supra]. If first salvor is able to save property, there can not be co-salvors, without the assent of the first salvor, and if the second salvor were not on a new undertaking, but is to be regarded as a continuation of the original enterprise, then the Gary must be regarded on the principle of admiralty law as the meritorious salvor of whatever is preserved, and is entitled to the possession of it, and the possession of the Maryland, the second salvor, was tortious, notwithstanding that the Gary had abandoned the Sherman, and was in port at Wilmington when the Maryland met the Sherman on the high seas. See The John Gilpin [Case No. 7,345], and cases cited; The Blenden-Hall, 1 Dod. 414. That if abandonment was from a mistake of judgment, it relieves the party from moral blame, but not from legal consequences of his acts. As to the contract: The contract was for towage to a port of safety. The port of safety was of the essence of the contract. To entitle libellant to the benefit of contract, he must prove performance. "In general, if the agreement be that one party shall do an act, and for the doing thereof the other shall pay a sum of money, the doing of the act is a condition precedent to the payment, and the party who is to pay shall not be compelled to part with his money until the thing be performed." Chit. Pl. 1, 322; The Hector, 3 Hagg. Adm. 94. Admiralty guards the rights and enforces the duties arising or to be performed on the sea. It has been called the humane providence that watches over those who go down to the sea in ships and do their business on the great deep.

The case is stated so fully in the opinion of the court that no addition can be made to it.

CHASE, Circuit Justice. It is not likely that I shall arrive at any other conclusion in this case than that to which the evidence has already brought me. It is a case of salvage. The libellant makes no claim on the ground of contract. Admiralty guards the rights and enforces the duties arising or to be performed on the sea. It has been called the humane providence that watches over those who go down to the sea in ships and do their business on the great waters. Its rules of proceeding are not those of the common law. They are not technical. They aim at substantial justice, according to the principles of equity, applicable in each case.

What is the substantial justice in this case? The steamship Sherman on her voyage southward was disabled by the breaking of her shaft near Cape Lookout, and was lying inshore in a position where a change of weather might drive her aground, and cause a total loss. Her engine was useless. She had sails, but the evidence shows that the ship could not be navigated safely without the aid of steam. Where she was, her sails seem to have been of no use to her. In this condition of distress, she made the ordinary signals for assistance from other vessels which might be in the vicinity.

Hearing the signals the Gary came to her relief, and negotiations took place which show the estimate put by the respective parties on the assistance needed and its value. It was agreed between them that the Gary

would tow the Sherman into Norfolk, for fifteen thousand dollars. Under the circumstances of this case, the contract can not be the measure of damages, but it is proper to take it into consideration as showing the views of the parties at the time. The fact that the contract was made can not deprive the Gary, as salvor, of her right of compensation, if, though not performing the contract, she rendered salvage service, and did not forfeit her claim to compensation by her subsequent conduct.

Under the contract of towage, the vessels proceeded some time in the direction of Norfolk, when an unfavorable change of weather took place. The captain of the Gary, satisfied that it would take a great deal of time to get into Norfolk, proposed to change the port of destination, and go to Charleston. The proposition was assented to by the captain of the Sherman, and the courses of the steamers changed accordingly. They proceeded safely and easily in the new direction until they reached Frying Pan shoals, where the difficulties which give rise to this action occurred.

I can not resist the impression made by the testimony for the libellants, that both vessels were quite safe at that moment. Undoubtedly there was an alarm on board of the steamer, and there was no reason for it, for the leadsman reported four and a half fathoms water and shoaling. The evidence satisfies me that this report was an error. The captain of the Sherman, however, necessarily became anxious about the situation of his ship, and changed her course notwithstanding the captain of the Gary, to whom he called, assured him that there was no danger. From this unnecessary change of course all the subsequent mischief arose. The Gary endeavored to accommodate herself to the movements of the Sherman, and in consequence of the maneuvers of the two vessels, the hawser by which the Sherman was towed parted, and the two vessels separated. In this state of things it was the duty of the Sherman to lay to and wait assistance from the Gary, which was obliged to take in the hawser before the vessel could be safely navigated. Instead of doing this, the Sherman proceeded under sail, the wind being favorable, towards Charleston. On the other side, it was the duty of the Gary, as soon as possible, to render the stipulated assistance.

There is much conflict in the testimony upon the point whether the Sherman made any signals after the vessels separated. The weight of the evidence is that she did not. On the other hand, the evidence shows that when the hawser was brought on board the Gary, there was evidence that it had been cut on the Sherman. The captain of the Gary concluded naturally enough, that the separation of the vessels was designed. The Sherman had gone off, as he thought, with the intent to get rid of the towage. Under these circumstances he thought it useless to go in pursuit.

I do not think that the evidence that the hawser was cut is conclusive, though it is certainly strong. I think that the appearances, regarded by witnesses as evidence that it was cut, may be well enough accounted for by the peculiar circumstances under which the hawser parted. The captain of the Gary, however, certainly had reason for the conclusion he came to. He knew the vessels were safe at the time the disturbance arose upon the Sherman. The steamer had gone off without apparent reason; there was what seemed to him strong evidence of a fraudulent intent to evade the contract on her part.

Although this conclusion does not seem warranted by the evidence before me, there was in the circumstances of the case, in my opinion, a sufficient excuse to the captain of the Gary for not proceeding in search of the Sherman. He is not entitled to payment under the contract, as he would have been if he had followed the Sherman and offered to continue in the performance of it, and that offer had been refused; but I think he was entitled to salvage. Through the aid of the Gary, the Sherman had been rescued from danger, and brought safely a great part of the way to Charleston. Favorable winds enabled her to proceed still further without that aid, and then she found another vessel which towed her into port. Under these circumstances, I am inclined to regard this as a case of salvage, in which two vessels performed successfully the salvage services. None of the cases which have been cited in argument are exactly similar, but the principles upon which some of them were decided sustain, as I think, this view.

This leaves only the question of compensation to be determined. Undoubtedly, if the Gary had pursued the Sherman and offered continued assistance, her case would have been better; perhaps, had she done so, and her further assistance had been declined, she might have been entitled to the full amount stipulated in the contract. As it was, I think she was entitled to such an amount as would be a fair compensation for the services actually rendered by her. She rescued the Sherman from a certain degree of peril; by deviating from her course to render that assistance, she forfeited her insurance; a considerable time was devoted to the service, and a certain amount of expenditure was incurred. It is difficult to say what is a fair reward for the services thus rendered.

Under the circumstances, it seems proper to refer to the testimony concerning the attempt to compromise the difference between the owners of the two vessels. It appears that the owners of the Gary were willing to take four thousand dollars, and that the Sherman offered three thousand dollars. This evidence, to be sure, is by no means conclusive as to the actual value of the services,

but before I heard it I inclined to the opinion that three thousand five hundred dollars might be fairly decreed, and this evidence confirmed that opinion. Upon the whole, therefore, I will pronounce for the libellant, and decree three thousand five hundred dollars as salvage.